IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WEST BEND MUTUAL INSURANCE COMPANY,<br><br>                   **Plaintiff,**<br><br>      **v.**<br><br>PROCACCIO PAINTING AND DRYWALL COMPANY, INC.,<br><br>                 **Defendant.** | **Case No. 12 C 6425**<br><br>**Hon. Harry D. Leinenweber** |

MEMORANDUM OPINION AND ORDER

Before the Court are two motions by Defendant Procaccio Painting and Drywall Company, Inc. (hereinafter, "Defendant" or "Procaccio"). The first is Procaccio's Motion to Dismiss Count I of the Complaint. The second is a Motion for Summary Judgment on Count II of the Complaint and Counts I-IV of Procaccio's Counterclaim. For the reasons stated herein, the Motion to Dismiss is granted, and the Motion for Summary Judgment is granted in part and denied in part.

I.  BACKGROUND

Plaintiff West Bend Mutual Insurance Company (hereinafter, "Plaintiff" or "West Bend") sells workers' compensation insurance to employers. Defendant procured its workers' compensation insurance from West Bend for years, but in 2011 the relationship soured when Procaccio complained to the Illinois Department of

Insurance that West Bend overcharged it by improperly manipulating credits. The Department of Insurance declined to get involved, and West Bend filed this suit seeking a declaratory judgment that its credit adjustments were proper. Procaccio responded by filing a Motion for Partial Dismissal, Counterclaims for breach of contract and violations of the Illinois Insurance Code, and a Motion for Partial Summary Judgment.

The following facts are undisputed except where noted. Procaccio is a large construction company that operates in Illinois. Procaccio first obtained workers' compensation insurance from West Bend, a Wisconsin corporation, in 2001, and renewed the policy each year through at least 2011. Each renewal consisted of an Information Page (which calculated the premium due and contained various terms and conditions), as well as numerous endorsements identified on an Endorsement Schedule (each of which contained additional terms and conditions). The initial renewal policy issued each year contained only an estimated premium, but also allowed the premium to be adjusted through the issuance of subsequent endorsements:

> This policy includes at its effective date the Information Page and all endorsements and schedules listed there. It is a contract of insurance between you (the employer named in Item 1 of the Information Page) and us (the insurer named on the Information Page). The only agreements relating to this insurance are stated in this policy. The terms of this policy may not be changed or waived except by

> endorsement issued by us to be part of this
> policy.

*See, e.g.*, Renewal Policy dated Dec. 19, 2005 (Compl. Ex. A, ECF No. 1-1 at Page ID #68).

One such adjustment made each year involved the Illinois Contracting Classification Premium Adjustment Program (the "ICC Program"). Under the ICC Program, an employer may be entitled to a credit toward its workers' compensation insurance premium based on the number of contractors it employed and the average hourly wage it paid. Because Procaccio employees were union workers who earned high hourly wages, it was entitled to a sizeable credit each year. The credit was computed each year using a premium adjustment factor determined by the National Council on Compensation Insurance, but usually the factor was not available at the time the renewal policies issued. Thus, each year's renewal policy contained the following endorsement:

> The premium for the policy may be adjusted by
> an Illinois Contracting Classification Premium
> Adjustment factor. The factor was not
> available when the policy was issued. If you
> qualify, or if an estimated factor has been
> applied, we will issue an endorsement to show
> the proper premium adjustment factor after it
> is calculated.

*See, e.g., id.* at Page ID #78. Although the initial renewal policy issued by West Bend each year did not show the proper ICC premium adjustment factor, it subsequently issued an endorsement which

showed that year's factor. *See*, *e.g.*, Endorsement issued Jan. 18, 2006, (Compl., Ex. A, ECF No. 1-1 at Page ID #48).

Because the ICC premium adjustment factor often entitled Procaccio to a sizeable credit, but was not available when the policy issued, West Bend alleges that the parties arranged to front the credit to Procaccio. Specifically, West Bend alleges that it inflated another credit offered to Procaccio on the renewal policy — the Schedule Modification credit — by the amount of the credit it anticipated from the ICC premium adjustment factor. Then, when the ICC premium adjustment factor was announced, West Bend reduced the Schedule Modification credit by the same amount. That way, West Bend alleges, Procaccio avoided the need to pay a high initial premium, only to receive a sizeable refund a short time later upon the announcement of the ICC premium adjustment factor.

West Bend alleges that Procaccio's president, Doris Procaccio, was aware of the practice because (1) she was present at each of the renewal meetings where insurance agents explained it to her; (2) during those meetings she expressed her approval of the arrangement; and (3) she was advised by e-mail of the effect the arrangement would have on the Schedule Modification credit. According to West Bend, the parties carried out this arrangement for the policy years 2006, 2007, and 2010. During each of those years, the alleged arrangement had the following effect on the Schedule Modification credit:

- 2006 Policy Period: The initial Schedule Modification credit was 51.7%, but an endorsement issued January 26, 2006, dropped the credit to 30%, amounting to a reduction in the credit of $180,681;

- 2007 Policy Period: The initial Schedule Modification credit was 53%, but an endorsement issued January 2, 2007, dropped the credit to 30%, amounting to a reduction in the credit of $78,053; and

- 2010 Policy Period: The initial Schedule Modification credit was 10%, but an endorsement issued March 25, 2010, dropped the credit to 7%, amounting to a reduction in the credit of $1,199.

West Bend alleges that each year's reduction to the Schedule Modification credit offset the credit attributable to the ICC premium adjustment factor, per the parties' arrangement.

Procaccio responds that each year's policy was an integrated contract, and that the parties' agreement must be discerned based on the terms of the policy or its endorsements. According to Procaccio, while the policy allowed for subsequent endorsements to reflect any credit due as a result of the ICC premium adjustment factor, the policy contained no similar allowance for adjusting the Schedule Modification credit.

Although West Bend lowered the Schedule Modification credits early in the 2006, 2007, and 2010 policy years, for reasons unspecified in the record, Procaccio did not complain about it until November 28, 2011, when it wrote to the Illinois Department of Insurance asking that West Bend be ordered to honor the initial

Schedule Modification credit for those years. *See*, Procaccio Letter dated November 28, 2011 (Aff. of D. Cunningham, Ex. J, ECF No. 41-10). The Department of Insurance responded by advising West Bend that "all of the factors that make up the premium" such as "scheduled credits" are "frozen" once the "effective date of renewal arrives." Dept. of Ins. Letter dated May 17, 2012 (Compl. Ex. D, ECF No. 1-4).

West Bend responded to the Department of Insurance on June 14, 2012, asking to appeal the Department's finding and requesting a hearing because it believed "facts remain in dispute concerning the contractual arrangement between West Bend and Procaccio." West Bend letter dated June 14, 2012 (Compl. Ex. E, ECF NO. 1-5). On July 23, 2012, the Department of Insurance replied that the "questions raised in your correspondence are not matters that are heard by the Department. The Department does not arbitrate or mediate contractual disputes between the parties" and "respectfully declines to provide a forum to address the questions you raise." Dept. of Ins. Letter dated July 23, 2012 (Compl. Ex. F, ECF No. 1-6).

West Bend then filed the instant suit. Its Complaint consists of two counts. In Count I, it seeks a declaratory judgment that its adjustment of the Schedule Modification credit to offset the ICC premium adjustment factor in the 2006, 2007, and 2010 policies

was proper.  In Count II, it seeks a declaratory judgment that it does not owe Procaccio any refund for those policy years.

In response, Procaccio filed a Counterclaim, consisting of four counts.  In the first three counts, Procaccio alleges breach of contract based on West Bend's adjustment of the Schedule Modification credit in the 2006 (Count I), 2007 (Count II), and 2010 (Count III) policies.  In Count IV, Procaccio alleges that West Bend's adjustment of the Schedule Modification credit violated the Illinois Insurance Code.  West Bend, in turn, asserted affirmative defenses to the counterclaims.

Before the Court are two Motions filed by Procaccio.  First is a Motion to Dismiss Count I of West Bend's Complaint.  Second is a Motion for Summary Judgment on Count II of West Bend's Complaint and all counts of Procaccio's Counterclaim.  Although the Motion for Summary Judgment is the later-filed motion, the Court shall address it first because its resolution is also dispositive of the Motion to Dismiss.

## II.  LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Valenti v. Qualex, Inc.*,

970 F.2d 363, 365 (7th Cir. 1992). Moreover, a court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *See Valenti*, 970 F.2d at 365.

Thus, to withstand a motion for summary judgment, the nonmoving party must show that a dispute about a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party may not rest merely upon the allegations or details in his pleading, but instead, must set forth specific facts showing there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322.

## III. **ANALYSIS**

### A. **Motion for Summary Judgment**

#### 1. *Procaccio's Counterclaims*

##### a. *Breach of Contract (Counts I - III)*

The Court shall first address Procaccio's Motion for Summary Judgment on Counts I, II, and III of its Counterclaim (ECF No. 32), in which it alleges that West Bend reduced the Schedule Modification credit in breach of the terms of the 2006, 2007, and 2010 renewal policies. The relevant terms of each policy are identical so, for ease of analysis, the Court's discussion applies equally to each of the three policies.

The Court applies Illinois law because that is where this suit was filed and because both parties have applied Illinois law.

*See Ryerson Inc. v. Federal Ins. Co.*, 676 F.3d 610, 611-12 (7th Cir. 2012). Under Illinois law, the court interprets the meaning of the unambiguous terms of a contract as a matter of law. *See InsureOne Indep. Ins. Agency, LLC v. Hallberg*, 976 N.E.2d 1014, 1037 (Ill. App. Ct. 2012). When the terms of the contract are clear, the court applies the terms as written, giving effect to the ordinary and natural meaning of the contract's language. *Id.* Because contracts are interpreted as a matter of law, claims that turn on the interpretation and construction of a contract, rather than on disputed material facts, are suitable for resolution on a motion for summary judgment. *See Kmart Corp. v. Footstar, Inc.*, No. 09 CV 3607, 2012 WL 1080262, at *12 (N.D. Ill. 2012).

To begin, West Bend argues that Procaccio's Motion for Summary Judgment should be denied as premature under Federal Rule of Civil Procedure 56(d). Under Rule 56(d), if a "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to a motion for summary judgment], the court may" defer ruling on the motion, allow time for discovery, or issue any other appropriate order. FED. R. CIV. P. 56(d).

In support, West Bend states that fact discovery is still ongoing, and that it requires additional discovery. Specifically, it submits an affidavit from counsel stating that, to oppose the motion, it needs to depose Doris Procaccio regarding six documents

obtained from Procaccio's initial disclosures.  The six documents are similar in nature.  They consist of faxes or e-mails from Prime Meridian to Doris Procaccio, or notations made on worksheets found among Procaccio's papers.  West Bend argues that they memorialize an agreement to inflate initially the Schedule Modification credit and then decrease it to offset the credit that resulted from the issuance of the ICC premium adjustment factor.  *See* Aff. of D. Cunningham, Exs. B-I, ECF Nos. 41-2 - 41-9.

However, for the reasons explored in more detail below, the parties' agreements are gleaned from the written terms of the renewal policies, which contain language acknowledging that "[t]he only agreements relating to this insurance are stated in this policy."  *See, e.g.*, Renewal Policy dated Dec. 19, 2005 (Compl. Ex. A, ECF 1-2 at Page ID #68).  Because the only evidence that West Bend contends requires additional time to explore involves purported agreements not reflected within the written terms of the renewal policies, the evidence would have no bearing on the Court's interpretation of the parties' agreements and, therefore, does not warrant the denial of Procaccio's Motion for Summary Judgment under Rule 56(d).  *See Penn Mut. Life Ins. Co. v. Greatbanc Trust Co.* --- F.Supp.2d ---, No. 09 CV 6129, 2012 WL 3437161, at *3 (N. D. Ill., Aug. 15, 2012).

Because the issues raised in the Motion for Summary Judgment may be resolved as a matter of law without additional development

of the record, the Court turns to the merits of the motion. West Bend argues that the Motion should be denied because its reduction of the Schedule Modification credit in 2006, 2007, and 2010 was proper under the terms of the parties' agreements for the following reasons: (1) under the terms of the ICC Premium Adjustment Endorsement, the parties "clearly and unequivocally" agreed to use the Schedule Modification credit to offset the ICC premium adjustment factor; (2) the parties' agreement can be determined by reading in tandem (a) the ICC Premium Adjustment Endorsement, and (b) the endorsement that adjusted the Schedule Modification credit and provided for the ICC premium adjustment factor credit; and (3) the adjustment to the Schedule Modification credit was proper under its Schedule Modification plan on file with the State of Illinois.

I. ICC Premium Adjustment Endorsement

First, West Bend contends that the agreement to inflate and then later reduce the Schedule Modification credit to offset the ICC premium adjustment factor is evidenced not by an oral agreement, but by the written terms of the policies. It argues that the "ICC Premium Adjustment Endorsement contained in each of the West Bend Policies clearly and unequivocally expresses the parties' agreement regarding the premium adjustment procedure," specifically, that "West Bend would issue the renewal policy with a scheduled rating credit set high enough to include the anticipated Illinois Contractor's Credit, then would later decrease

the scheduled credit amount in order to offset the Illinois Contractor's Credit by way of endorsement." Pl.'s. Resp. at 7, ECF No. 36. Thus, West Bend claims, the premium adjustment arrangement is a written term of the contract.

The ICC Premium Adjustment Endorsement provides:

> The premium for the policy may be adjusted by an Illinois Contracting Classification Premium Adjustment factor. The factor was not available when the policy was issued. If you qualify, or if an estimated factor has been applied, we will issue an endorsement to show the proper premium adjustment factor after it is calculated.

Compl. Ex. A, ECF No. 1-1, Page ID #78. Under those terms, the parties agreed only to the issuance of an endorsement "to show the proper premium adjustment factor." *Id.* The quoted terms do not provide for any adjustment to the Schedule Modification credit. Accordingly, the ICC Premium Adjustment Endorsement does not, as West Bend contends, "clearly and unequivocally express[] the parties' agreement regarding the premium adjustment procedure" that includes adjusting the Schedule Modification. Pl's. Resp. at 7, ECF No. 36.

Even West Bend must refer back to the alleged oral agreement to explain how the terms of the ICC Premium Adjustment Endorsement can be construed as an agreement to adjust the Schedule Modification credit to offset the ICC premium adjustment factor. *See*, *e.g.*, Pl's. Resp. at 6, ECF No. 36 ("Procaccio is contending that it should not have been required to comply with the very

premium adjustment procedure reflected in the policies and *that was fully explained to it prior to the policies' enactment*.") (emphasis added); Pl.'s. Resp. at 7 ("*As was outlined to Procaccio at the time of each policy renewal*, West Bend would issue the renewal policy with a scheduled rating credit set high enough to include the anticipated Illinois Contractor's Credit, then would later decrease the scheduled credit amount in order to offset the Illinois Contractor's Credit by way of endorsement.") (emphasis added). The alleged oral understanding between the parties is irrelevant because the 2006, 2007, and 2010 renewal policies contain an integration clause under which the parties acknowledged that "[t]he only agreements relating to this insurance are stated in this policy." *See, e.g.*, Renewal Policy dated Dec. 19, 2005 (Compl. Ex. A, ECF No. 1-1 at Page ID #68). "The effect of integration is to preclude[ ] evidence of understandings, not reflected in a writing, reached before or at the time of its execution which would vary or modify its terms." *Midwest Builder Distrib., Inc. v. Lord & Essex, Inc.*, 891 N.E.2d 1, 18 (Ill. App. Ct. 2007).

West Bend argues that the integration clause does not prohibit parole evidence of the alleged oral agreement. In support, it relies on *Jacobs v. Paul Revere Life Ins. Co.*, No. 04 CV 995, 2004 WL 1393605, at *2 (N.D. Ill. June 18, 2004), in which the court considered parole evidence of the parties' agreement despite the

existence of an integration clause like the one at issue here. However, in *Jacobs*, the court held that the parties' written agreement contained an ambiguity that could be cleared up only through parole evidence. *Id.* at *3. Neither party has identified any language in the 2006, 2007, or 2010 renewal policies that they contend is ambiguous. Accordingly, the reasons for relying on parole evidence in *Jacobs* do not present themselves in this case.

Thus, the ICC Premium Adjustment Endorsement cannot be construed as an agreement to lower the Schedule Modification credit to offset the ICC premium adjustment factor.

### ii. Subsequent Endorsements

Next, West Bend argues that construing the ICC Premium Adjustment Endorsement together with the subsequent endorsement which lowers the Schedule Modification credit to offset the ICC premium adjustment factor reveals the parties' purported agreement. According to West Bend, "one need only look at the endorsements to determine what the [Schedule Modification] credit was initially, and what it subsequently was adjusted to in order to locate the factors referred to in the ICC premium Adjustment Endorsement." Pl.'s Resp. at 8, ECF No. 36.

While the subsequent endorsements add the ICC premium adjustment factor and reduce the Schedule Modification credit, the endorsements do not tie together the two changes, or explain the reduction to the Schedule Modification credit. For instance, the

January 26, 2006 endorsement adjusting the policy originally issued on December 19, 2005, shows merely that the original Schedule Modification of 51.7% was deleted, an ICC credit factor of .67 was applied, and a new Schedule Modification of 30% was applied. The endorsement contains no terms that show the adjustment to the Schedule Modification was made pursuant to an agreement by the parties to offset the effect of the ICC premium adjustment factor.

Thus, even when considered together, the ICC Premium Adjustment Endorsement and the subsequent endorsements cannot be construed as an agreement to lower the Schedule Modification credit to offset the ICC premium adjustment factor.

### iii. Schedule Modification Plan

Next, West Bend argues that the policies allowed it to adjust the Schedule Modification credit, regardless of any agreement to use the Schedule Modification credit to offset the ICC credit. As West Bend notes, the contract contains the following term: "The terms of this policy may not be changed or waived except by endorsement issued by us to be part of this policy." *See, e.g.*, Renewal Policy dated Dec. 19, 2005 (Compl. Ex. A, ECF No. 1-1 at Page ID #68). West Bend contends that under that term, it was entitled to adjust the Schedule Modification credit by way of endorsement, which it did on January 26, 2006 to the 2006 policy, on January 2, 2007 to the 2007 policy and on March 25, 2010 to the 2010 policy. *See* Jan. 26, 2006, Endorsement (Compl. Ex. A, ECF

No. 1-1 at Page ID #42-43); Jan. 2, 2007, Endorsement (Compl. Ex. B, ECF No. 1-2 at Page ID #104-05); Mar. 25, 2010, Endorsement (Compl. Ex. C, ECF No. 1-3at Page ID #145-46).

In response, Procaccio does not dispute that the policies allowed their terms to be changed by endorsement. Rather, it argues that other policy terms limited the types of changes West Bend could make to its premiums. Specifically, the policies contained the following provision: "THE PREMIUM FOR THIS POLICY WILL BE DETERMINED BY OUR MANUALS OF RULES, CLASSIFICATIONS, RATES, AND RATING PLANS." *See*, *e.g.*, 2006 Policy (Compl. Ex. A, ECF No. 1-1 at Page ID #60). Each policy contained another, similarly-worded provision: "All premiums for this policy will be determined by our manuals of rules, rates, rating plans and classifications." *See*, *e.g.*, *id.* at Page ID #72. Thus, according to Procaccio, any change to the premiums must conform to West Bend's "manuals of rules, rates, rating plans, and classifications." *Id.* In addition, the Illinois Insurance Code requires insurance companies to "apply correct classifications, payrolls, and other factors of a rating system to compute premiums." 215 Ill. Comp. Stat. 5/462b.

West Bend concedes that changes must conform to its manuals of rules, rates, rating plans and classifications, and contends that its adjustment of the Schedule Modification credit complied with its Schedule Rating Plan for Illinois. *See* Pls.' Resp. to Def.'s Statements of Fact ¶¶ 21, 23, 27, ECF No. 37. Under the Schedule

Rating Plan for Illinois, West Bend was allowed to offer a range of modifications for six risk characteristics. *See* Schedule Rating Plan for Illinois, (Def's. Answer and Countercl. Ex. A, ECF No. 12). Specifically, the Plan allowed the following modifications attributable to the following risks:

| Risk Characteristic | Range of Modification |
|---|---|
| 1. Premises–Upkeep, condition | 20% credit – 30% debit |
| 2. Classification Peculiarities | 15% credit – 30% debit |
| 3. Medical Facilities | 10% credit – 30% debit |
| 4. Safety Devices | 10% credit – 30% debit |
| 5. Employees – Selection, training, supervision, and experience | 20% credit – 30% debit |
| 6. Management | 10% credit – 30% debit |

*Id.* West Bend says its adjustments to the Schedule Modification credit were "consistent with West Bend's schedule rating plan, as the schedule rating plan permits West Bend to modify premiums to recognize those special characteristics of an Illinois Worker's Compensation risk." Pl.'s Resp. at 9, ECF No. 36.

However, West Bend does not explain which of the risk characteristics its adjustments fall under. In fact, given that the maximum credit available for any risk characteristic is 20%, its elimination of credits totaling 21.7% from the 2006 policy and 23% from the 2007 policy cannot be attributed to any one risk characteristic, but would have been based on adjustments to multiple risk characteristics. Yet, West Bend has not identified any risk characteristic or combination of risk characteristics upon which its adjustments were based.

Instead, West Bend states merely that the credit reductions were made "in order to offset the Illinois Contractor's Credit by way of endorsement." Pl.'s Resp. at 7, ECF No. 36. But the Illinois Contractor's Credit is not listed among the risk characteristics for which the Schedule Rating plan permits premium modifications. Moreover, the parties agree that the Schedule Rating plan is designed to account for "the probability or severity of future losses." Pl.'s Resp. to Def.'s Statements of Fact ¶ 27 ECF No. 37. That is a different concern from what is addressed by the ICC premium adjustment factor, which the parties agree accounts for the number of highly-compensated contractors that are employed. *See* Def.'s Resp. to Pl.'s Statements of Add'l Facts ¶¶ 8, 9, ECF No. 43. Indeed, the parties agree that modifications under the Schedule Rating plan are to be used to account only for those "risk factors *not* accounted for by other rating adjustments," and the ICC premium adjustment factor already accounts for the factors it is designed to address. Pl.'s Resp. to Def.'s Statements of Fact ¶ 27, ECF No. 37 (emphasis added).

West Bend has failed to identify any provision under the Schedule Rating plan entitling it to adjust the Schedule Modification credit based on the release of the ICC premium adjustment factor. Thus, it has failed to show that its reduction to the Schedule Modification credit to offset the ICC premium adjustment factor conformed to its "manuals of rules, rates, rating

plans, and classifications," or was otherwise proper under the terms of the 2006, 2007, or 2010 policies.

Procaccio also argues that it is entitled to summary judgment on Counts I-III of its Counterclaim because the Illinois Department of Revenue found that "West Bend's adjustments of the schedule credits were improper and in violation of the policy terms and the manual provisions incorporated into the policies." Def.'s Mot. For Summ. J. at 3, ECF No. 34. Procaccio contends that the "Department's opinions are entitled to great deference . . . ," citing *Village of Oak Park v. Village of Oak Park Firefighters Pension Bd.*, 839 N.E.2d 558, 568 (Ill. App. Ct. 2005). Procaccio's argument is unavailing for at least two reasons. First, the May 17, 2012 letter upon which Procaccio relies does not address whether West Bend's adjustment to the Schedule Modification credit breached the renewal policies but, rather, whether it violated 215 Ill. Comp. Stat. 5/143.17a. *See* Dept. of Ins. letter dated May 17, 2012 (Compl. Ex. D, ECF No. 1-4). Second, courts will give deference to an agency's interpretation of ambiguities of a statute which that agency is charged with administering and enforcing. *See Hadley v. Illinois Dept. of Corrections*, 864 N.E.2d 162, 165 (Ill. 2007). Consequently, even if the Department had opined on the breach of contract issue, its opinion would not be afforded great deference because it would not concern the interpretation of a statute the Department administers or enforces.

Having determined that West Bend breached the 2006, 2007, and 2010 policies by adjusting the Schedule Modification credit without a contractual basis for doing so, the Court now turns to West Bend's affirmative defenses.

### iv.  Affirmative Defenses

West Bend asserted several affirmative defenses which it claims defeat Procaccio's counterclaims for breach of contract. However, each affirmative defense fails as a matter of law.

### (1)  Laches

First, West Bend contends that under the doctrine of laches, Procaccio waited too long — five years — to first complain about West Bend's practice of adjusting the Schedule Modification credit to offset the ICC premium adjustment factor.  Laches is "such a neglect or omission to assert a right, taken in conjunction with a lapse of time of more or less duration, and other circumstances causing prejudice to an adverse party, as will operate to bar relief in equity." *Meyers v. Kissner*, 594 N.E.2d 336, 340 (Ill. 1992).  West Bend argues that it was prejudiced by Procaccio's five-year delay because it continued to renew Procaccio's policies using the same premium calculation method that Procaccio only now asserts was improper.

Laches is an equitable doctrine reserved historically for equitable claims, not actions at law for money damages. *See Nature Conservancy v. Wilder Corp. of Del.*, 656 F.3d 646, 649-51 (7th Cir.

2011). Although Illinois courts have purported to apply the doctrine to legal claims, the Seventh Circuit found on closer examination that those courts actually were addressing quasi-equitable claims, and found that no court had applied the doctrine to a claim for purely money damages. *Id.* (citing *Maksym v. Loesch*, 937 F.2d 1237, 1248 (7th Cir. 1991)).

West Bend contends that Procaccio's claims fall within that narrow class of quasi-equitable claims because they seek the equitable remedy of disgorgement rather than money damages. "Disgorgement is an award based on the defendant's profits rather than the plaintiff's loss." *Jablonski v. Riverwalk Holdings, Ltd.*, No. 11 CV 840, 2012 WL 2254257, at *8 (N.D. Ill. Jun. 14, 2012). To obtain disgorgement, a plaintiff must show that, "in harming her, [the defendant] gained more than her actual damages." *Oshana v. Coca-Cola Co.*, No. 04 CV 3596, 2005 WL 1661999, at *10 (N. D. Ill. July 13, 2005).

Procaccio's claims for breach of contract seek only the return of premiums it contends were calculated improperly. It has not asserted a claim for profits West Bend earned as a result of Procaccio's purported overpayment. Procaccio's claims are thus not the type of quasi-equitable claims to which the doctrine applies. As such, West Bend's affirmative defense of laches fails as a matter of law.

(2)  Equitable Estoppel

Second, West Bend contends that the doctrine of equitable estoppel prohibits Procaccio from asserting claims of breach of contract.  A party claiming estoppel must demonstrate that:

> (1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof.

*In re Marriage of Mancine*, 965 N.E.2d 592, 599 (Ill. App. Ct. 2012).

West Bend asserts that equitable estoppel is applicable because it renewed the workers' compensation policies in reasonable reliance on Procaccio's "assent[] to the premium calculation method employed."  Pl.'s Resp. at 14, ECF No. 36.  However, West Bend's argument is unsupported by the affidavit it cites, in which its regional underwriting manager, Rhonda Topliff, describes West Bend's detrimental reliance as follows:

> Procaccio's recent attempt to renege on its agreement by claiming that West Bend was not entitled to reduce the schedule credit upon the NCCI's determination of the Illinois Contractor's Credit is extremely prejudicial

to West Bend.  In deciding to issue the
policies to Procaccio, West Bend relied upon
Procaccio's agreement that the premium would
be adjusted in this fashion.

Aff. of R. Topliff ¶ 9, ECF No. 40.  In other words, West Bend

contends that it issued the policies in reliance on its alleged

understanding with Doris Procaccio that West Bend would front-end

the anticipated credit from the ICC premium adjustment factor by

temporarily inflating the Schedule Modification credit.  But as

discussed above, that alleged understanding is not reflected in the

terms of the policies.  Although the reasonableness of a party's

reliance is normally a question of fact, it can be determined as a

matter of law "where no trier of fact could find that it was

reasonable to rely on the alleged statements or when only one

conclusion can be drawn." *Cozzi Iron & Metal, Inc. v. U.S. Office

Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001).  Continued

reliance on alleged oral agreements not stated in a policy is

unreasonable where a contract contains an integration clause like

those in the 2006, 2007, and 2010 policies that acknowledge "[t]he

only agreements relating to this insurance are stated in this

policy."  *See McVickers McCook, LLC v. Wal-Mart Stores, Inc.*,

No. 09 C 7523, 2010 WL 3283044, *6 (N.D. Ill. Aug. 12, 2010).

Accordingly, West Bend is unable to establish a critical

element of the doctrine of equitable estoppel, and the defense

fails as a matter of law.

### (3) Unclean Hands

West Bend next asserts the affirmative defense of unclean hands. The defense of unclean hands is also an equitable defense, not applicable to a claim for money damages for a breach of contract. *See General Electric Bus. Fin. Servs., Inc. v. Silverman*, 693 F.Supp.2d 796, 804 (N.D. Ill. 2010). In its response, West Bend offers no argument why this equitable defense should prevent summary judgment. Accordingly, West Bend's affirmative defense of unclean hands fails.

### (4) Failure to State a Claim

Neither of the parties addressed West Bend's cursory affirmative defense that Procaccio's counterclaim "fails to state a claim against West Bend upon which relief can be granted." Pl.'s Ans. and Aff. Defenses at 13, ECF No. 21. The defense is clearly insufficient, however. An affirmative defense must be adequately pled under the pleading standards of Federal Rule of Civil Procedure 8. *LaSalle Bank Nat'l Assoc. v. Paramont Props.*, 588 F.Supp.2d 840, 860 (N.D. Ill. 2008). West Bend provided no specifics as to how the counterclaim has failed to state a claim upon which relief may be granted. It is the type of "bare bones, conclusory allegation" that this Court can strike. *See LaSalle Bus. Credit v. Lapides*, No. 00 C 8145, 2003 U.S. Dist. LEXIS 2901 at *45 (N.D. Ill. Feb. 27, 2003). This affirmative defense also fails as a matter of law.

Having disposed of West Bend's affirmative defenses, the Court finds, as a matter of law, that West Bend breached the 2006, 2007, and 2010 policies by adjusting the Schedule Modification credit. The Court grants Procaccio summary judgment on Counts I-III of its Counterclaim.

### b.  Illinois Insurance Code (Count IV)

Procaccio also seeks summary judgment on Count IV of its counterclaim, in which it alleges that West Bend's adjustment of the Schedule Modification credit — the same adjustment underlying its breach of contract claims in Counts I-III — also violated the Illinois Insurance Code.  The damages Procaccio seeks in Count IV are identical to those it seeks in Counts I-III.  Because the Court has already granted summary judgment to Procaccio on Counts I-III, awarding it the same damages under Count IV would amount to a prohibited double recovery.  *See Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 963 (N.D. Ill. 2002).  As such, the Court denies Procaccio's Motion for Summary Judgment on Count IV as moot.

### 2.  Count II of West Bend's Complaint

Next, the Court addresses Procaccio's arguments for summary judgment on Count II of West Bend's Complaint.  In Count II, West Bend asks for a declaratory judgment that its adjustments to the Schedule Modification credits in 2006, 2007, and 2010 were proper and, therefore, it need not refund to Procaccio the difference in premium attributable to those adjustments.

As discussed during the analysis of Procaccio's counterclaims for breach of contract, West Bend breached the terms of the 2006, 2007, and 2010 policies when it lowered the Schedule Modification credits for reasons not provided by the terms of those policies. Because its adjustments to the Schedule Modification credits were improper, it is not entitled to a declaratory judgment that the adjustments were proper.

Accordingly, Procaccio's Motion for Summary Judgment on Count II of West Bend's Complaint is granted.

## B. Procaccio's Motion to Dismiss

The Court now returns to Procaccio's Motion to Dismiss Count I of West Bend's complaint (ECF No. 10). A complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The Seventh Circuit explained that this "[r]ule reflects a liberal notice pleading regime, which is intended to focus litigation on the merits of a claim rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009).

However, a complaint must contain "enough facts to state a claim to relief that is plausible on its face" and also must state sufficient facts to raise a plaintiff's right to relief above the speculative level. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 547 (2007). In *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) the Supreme

Court stated that a claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

In Count I, West Bend alleges that its adjustment to the Schedule Modification credit to offset the ICC premium adjustment factor was proper and asks for a declaratory judgment to that effect. However, as previously discussed, the adjustments made to the 2006 policy on January 26, 2006, to the 2007 policy on January 2, 2007, and to the 2010 policy on March 25, 2010, breached the terms of those policies. Accordingly, because the adjustments were not proper as a matter of law, West Bend cannot state a claim for a declaratory judgment that the adjustments were proper. Therefore, Procaccio's Motion to Dismiss Count I is granted. The dismissal is with prejudice because there are no allegations West Bend could make consistent with the allegations in the existing complaint under which West Bend would be entitled to the relief it seeks.

## IV. **CONCLUSION**

For the stated herein, the Court rules as follows:

1. Procaccio's Motion to Dismiss is granted. Count I of West Bend's Complaint is dismissed with prejudice;

2.   Procaccio's Motion for Summary Judgment on Counts I, II, and III of its Counterclaim, and on Count II of West Bend's Complaint, is granted;

3.   Procaccio's Motion for Summary Judgment on Count IV of its Counterclaim is denied as moot;

4.   Judgment is awarded to Procaccio on Counts I-III of its Counterclaim in the amount of $259,933. West Bend does not dispute the applicability of the Illinois Interest Act, under which Procaccio is also entitled to prejudgment interest computed at a rate of 5% per annum. *See* 815 Ill. Comp. Stat. 205/2. Procaccio shall file a position paper by 3/19/2013 identifying the amount of prejudgment interest sought as well as the computations used to determine that amount. West Bend shall respond by 3/26/2013; and

5.   Although West Bend did not seek the dismissal of Count IV of Procaccio's Counterclaim, Procaccio cannot obtain any additional damages on them, and so those claims are dismissed.

**IT IS SO ORDERED.**

_____
      Harry D. Leinenweber, Judge
      United States District Court

Date:3/5/2013

- 28 -